IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

ISIAH A. WATSON                                                                                      PLAINTIFF

V.                         Case No. 3:24-CV-00059-DPM-BBM

LELAND DUDEK, Acting Commissioner,
Social Security Administration[1]                                                         DEFENDANT

## RECOMMENDED DISPOSITION

This Recommended Disposition ("Recommendation") has been sent to United States District Judge D. P. Marshall Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Marshall may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

**I.   INTRODUCTION**

On July 8, 2021, Plaintiff Isiah A. Watson ("Watson") filed a Title II application for a period of disability and disability insurance benefits. (Tr. at 11). In the application, he alleged disability beginning on November 1, 2016. *Id*. The application was denied initially and on reconsideration. *Id*. After conducting a hearing, an Administrative Law Judge

---

[1] As of the date of this Order, Leland Dudek serves as Acting Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Dudek is automatically substituted as the Defendant.

("ALJ") denied Watson's application by written decision, dated April 7, 2023. (Tr. at 11–24).

The Appeals Council denied Watson's request for review of the ALJ's decision on January 19, 2024. (Tr. at 1–6). The ALJ's decision now stands as the final decision of the Commissioner, and Watson has requested judicial review. For the reasons stated below, the Court recommends that the Commissioner's decision be affirmed.

## II.     THE COMMISSIONER'S DECISION

Watson last met the insured status requirements of the Social Security Act on December 31, 2020.[2] (Tr. at 14). Watson was 17 years old on the alleged onset date of disability—November 1, 2016—and has not engaged in substantial gainful activity from the alleged onset date through his date last insured.[3]  (Tr. at 14, 217). At Step Two, the ALJ determined that Watson had the following severe impairments: idiopathic neuropathy, syringomyelia, paresthesia, cervicalgia, and thoracic spondylosis. (Tr. at 14).

At Step Three, the ALJ determined that Watson's impairments did not meet or equal a Listing.[4]  (Tr. at 16–18). The ALJ found that Watson has the residual functional capacity

---

[2] For Title II applications, a claimant must establish disability before the date last insured. (Tr. at 12).

[3] The ALJ followed the required five-step sequence to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g).

[4] 20 C.F.R. Part 404, Subpt. P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity." *Sullivan v. Zebley*,

("RFC") to perform work at the light exertional level, with the following additional limitations: (1) cannot climb ladders, ropes, and/or scaffolds; (2) can no more than occasionally stoop; (3) can no more than frequently climb ramps and stairs; (4) can no more than frequently crouch, kneel, and crawl; (5) must avoid concentrated exposure to "excessive vibration, extreme cold, hazardous machinery, and unprotected heights"; (6) can no more than frequently handle and finger bilaterally; and (7) can have no more than occasional exposure to irritants, such as "fumes, odors, dust, and gasses, and to poorly ventilated areas." (Tr. at 18).

At Step Four, the ALJ found that Watson had no past relevant work. (Tr. at 22–24). Finally, at Step Five, relying upon vocational expert ("VE") testimony, the ALJ found, based on Watson's age, education, work experience and RFC, that there are jobs in the national economy that Watson can perform. (Tr. at 22). Therefore, the ALJ concluded that Watson was not disabled from the alleged onset date through the date last insured. (Tr. at 24).

### III. DISCUSSION

#### A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is "supported by substantial evidence on the record as a whole and whether it is based on legal error." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42

---

493 U.S. 521, 532 (1990) (internal citations omitted). That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination of whether he actually can perform his prior work or other work. *Id*.

U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> [O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision. Reversal is not warranted, however, merely because substantial evidence would have supported an opposite decision.

*Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (internal quotations and citations omitted).

In clarifying the "substantial evidence" standard applicable to review of administrative decisions, the Supreme Court has explained: "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . 'is more than a mere scintilla.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*.

B. **Watson's Arguments on Appeal**

Watson contends that the evidence supporting the ALJ's decision is less than substantial. (Doc. 9 at 16–26). Specifically, Watson argues that: (1) the ALJ failed to provide a comprehensive analysis of Watson's subjective complaints, *id.* at 16–19; (2) the ALJ failed to give proper deference to Watson's medical records, *id.* at 19–21; (3) the RFC did not incorporate all of his limitations, *id.* at 21–23; and (3) the ALJ failed to prove there are substantial jobs Watson can perform, *id.* at 23–26. The Court will address each of

4

Watson's arguments, in turn.

### 1. The ALJ appropriately considered Watson's subjective complaints.

Watson first asserts that the ALJ did not properly evaluate his subjective complaints of pain. (Doc. 9 at 16–19). Specifically, Watson argues that the ALJ failed to consider all of his subjective complaints and ignored the consistency of his subjective complaints throughout the alleged period of disability and beyond.[5] (Doc. 9 at 17–19). For the reasons discussed below, Watson's argument is unsupported by the record, and the Court finds no error on this point.

When evaluating a claimant's subjective complaints of pain, the ALJ must consider objective medical evidence, the claimant's work history, and other evidence relating to: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions. *See Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019). "An ALJ need not explicitly discuss each factor," and he may "decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." *Id.* (internal citations omitted).

In evaluating Watson's subjective complaints of pain, the ALJ first considered the objective medical evidence—which reflects results that are generally considered to be no more than mild to moderate in severity—and noted that it did not support the severity of

---

[5] In his Reply Brief, Watson notes that he was prescribed four pain medications as evidence of the severity of his limitations. (Doc. 12 at 3–5). Watson does not, however, explain how his refusal to take his pain medication supports his argument.

5

pain and limitation alleged by Watson. (Tr. at 19). For example, the ALJ noted that Watson's MRI of his cervical and lumbar spine performed in 2017 revealed normal findings with no evidence of disc herniations, neural compression, or canal compromise at any level. *Id*. X-rays of Watson's sciatic joint performed in February 2018 revealed no acute findings. *Id*. Nerve conduction studies showed results that are no more than mild in severity. *Id*. And EMG/NCS studies performed between 2018 and 2021 showed no finding above that of "mild" severity. *Id*.

In addition to the objective medical evidence, the ALJ considered the clinical examinations in the record. For example, the ALJ considered a May 3, 2018 examination by Dr. Elzbieta Perry, who noted that Watson had "undergone a very thorough and extensive workup (including neurology, rheumatology, and hematology) and that all had concluded that there was 'nothing serious' going on and that 'everything was benign.'" (Tr. at 19–20). Moreover, the ALJ considered the treatment notes from a July 8, 2021 examination by Dr. Jose Lopez-Castellanos, who examined Watson and observed no objective findings of neuropathy. *Id.* The ALJ also discussed treatment notes from physical therapist Haley Soo dated October 18, 2018, wherein Soo noted that Watson repeatedly made excuses of high pain levels to avoid doing physical exercises during his session, even though he did "'not appear to be in any pain, showing no facial grimacing, [or] grunting, antalgic movements[.]'"[6] *Id*.

---

[6] For his part, Watson testified that he stopped physical therapy because "they did not realize that my type of pain, if I were to exercise, it would hurt even more." (Tr. at 71).

The ALJ also discussed the nature and extent of Watson's pain and his course of treatment, observing that "only relatively conservative treatment measures have been recommended" for Watson's alleged impairments. (Tr. at 20). In fact, Watson experienced pain relief with physical-therapy exercises and massage therapy.[7] (Tr. 484, 1872). Additionally, as the ALJ described, Watson reported to his physical therapist on April 26, 2018 that he felt "a lot" better than he had a few weeks earlier, specifically telling the therapist: "I've been doing better in the morning with less pain[.]" (Tr. at 20). In 2018, Watson also told providers that Tizanidine was helpful, and his back pain was "much improved" with the introduction of Gabapentin and Mobic. *Id.* Watson similarly reported on January 24, 2019, that he was "getting better overall[.]" *Id.* And, as the ALJ discussed, Watson also reported that: (1) Amitriptyline somewhat controlled his symptoms, and (2) he benefited from marijuana. *Id.*

The ALJ then observed that Watson was not always compliant with the recommendations of his providers, "despite his ability to benefit from prescribed treatment."[8] (Tr. at 20). For example, in September of 2020, Watson declined the use of neuropathic medications, and on March 10, 2022, Watson reported that he used Amitriptyline intermittently for approximately 2 months before discontinuing it. *Id.* And Watson similarly refused trigger point injections recommended for his reported back pain. *Id.*; (Tr. at 1872–1873). The ALJ also observed that a March 10, 2022 examination of

---

[7] Improvement in condition supports an ALJ's finding that a claimant is not disabled. *See Lochner v. Sullivan*, 968, F.2d 725, 728 (8th Cir. 1992).

[8] A failure to follow a recommended course of treatment weighs against a claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

Watson was limited due to his lack of cooperation, and Watson refused to consider trying alternative medications.[9] (Tr. at 20). Moreover, despite Watson's impairments—and despite Watson's acknowledgment that he was advised by his treatment providers to quit—the ALJ noted that records showed Watson's continued use of marijuana and cigarettes.[10] (Tr. 19, 76, 504).

The ALJ next considered Watson's ability to perform daily activities, like attending to personal care, preparing meals, shopping for groceries, doing laundry, washing dishes, and driving long distances. (Tr. at 21, 268–269, 461). The ALJ noted that Watson stated during a physical therapy session that these activities did not increase his pain. (Tr. 21). Furthermore, Watson testified that, during the disability period, he was able to play soccer, ride horseback, cut grass during the summers, make music (even on bad days), make himself food when his father was away for days at a time, drive himself to Wisconsin and to Texas, and drive himself 45 minutes each way to college.[11] (Tr. at 21, 63, 68, 75, 74). The Court notes that, in his September 26, 2021 Function Report, Watson stated he was

---

[9] The ALJ also noted that, on March 10, 2022, Watson refused to cooperate with an examination; specifically, Watson's behavior included "foul language, pressured speech, and extreme aggressiveness, to the point that [the doctor] recommended that [Watson] be discharged from treatment due to concern for the safety of the clinic staff." (Tr. 20).

[10] Watson testified that he stopped smoking marijuana daily eight months ago but that he continues to "take one or two hits" every three or four weeks. (Tr. 76).

[11] Such daily activities undermine his claims of disability. *Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995) (holding that daily tasks such as cooking, cleaning, visiting friends and relatives, and attending church undermined the party's claims of disability); *see, e.g., Milam v. Colvin*, 794 F.3d 978, 982 (8th Cir. 2015) (cooking, cleaning, showering, shopping); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) (driving, shopping, bathing, and cooking); *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012), 680 F.3d at 1067 (vacations, daily chores, providing self-care); *Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (some housework, cooking, and shopping).

able to do laundry daily, text, make phone calls, go the gas station, and that the only reason he does not have a wheelchair is that he refuses to use one.[12] (Tr. at 266–279).

Notwithstanding, the ALJ recognized Watson's history of idiopathic neuropathy, syringomyelia, paresthesia, cervicalgia, and thoracic spondylosis as severe impairments and limited Watson to light work with additional restrictions to account for Watson's subjective complaints, to include an allergy to certain animals and carpal tunnel syndrome. (Tr. at 21). Notably, although not required to, the ALJ considered evidence from outside of the relevant disability period regarding Watson's subjective complaints of pain. In sum, the ALJ properly considered and evaluated Watson's subjective complaints of pain and found some of those complaints were not entirely consistent with the evidence in the record. (Tr. at 19). This Court discerns no reversible error.

## 2. The ALJ gave proper deference to Watson's medical records.

Next, Watson argues that the ALJ did not give the proper deference to his medical records. (Doc. 9 at 19). In particular, Watson argues that his medical records show that his disability period actually began when he was eight years old; accordingly, his youthful age at the time of application should not be a deterrent to finding him disabled. (Doc. 9 at 20–21). However, for the reasons discussed below, the ALJ gave proper deference to Watson's medical records, and the Court discerns no error.

To begin, Watson argues that the ALJ should have considered that his pain-related issues began as early as eight years old. (Doc. 9 at 20). The medical records, and Watson

---

[12] The ALJ additionally noted that Watson's physical and mental-status examinations have been primarily normal. (Tr. at 21).

himself, contradict such a reading, however. Medical records show that Watson reported to his physical trainer that his pain began in mid-2016. (Tr. 473) ("Pt reports about 2.5 years ago he was playing in a soccer tournament and felt a muscle tightness type of feeling. Pt reports having gradual onset of back pain after that."). Despite this back pain, Watson testified that he was "doing soccer, track, and cross country" in the eleventh grade (2016). (Tr. 64). Further, the medical records show that Watson was on the soccer team in college, (Tr. 59, 431); was otherwise very active in sports, *id.* at 520; was able to walk up to three miles without pain, *id.* at 467; rated his pain as a 0/10, *id.* at 456; and was walking at least ten minutes a day without any pain, *id.* at 461. Watson's participation in such activities, despite years of on-going pain, would cut against any claim that Watson is disabled.

Additionally, Watson points to a myriad of medical records dating from 2021 and beyond. (Doc. 9 at 20). Watson specifically points out his complaints of pain prior to and immediately after his date last insured ("DLI"); his positive test for an undetermined autoimmune disease; his mental health decline in 2021; and his diagnosis of fibromyalgia. *Id.* The ALJ, however, *did* consider Watson's diagnosis of fibromyalgia—which was not diagnosed until almost two years *after* Watson's DLI. (Tr. 14). Likewise, the ALJ considered Watson's mental impairments of depression and anxiety and found that they did not cause more than minimal limitation. (Tr. at 15). Moreover, any records from 2021 are not relevant to determining whether Watson was disabled between November 1, 2016, and December 31, 2020. *See* (Tr. at 65) (informing Watson and counsel that they need "to take it between '16 and '20. A new diagnosis now does not matter. Keep during the timeframe.").

Finally, as recounted in § III(B)(1) *supra*, the ALJ specifically discussed the objective medical evidence presented to him. The ALJ noted that MRIs of Watson's lumbar and thoracic spine were normal with "no evidence of disc herniations, neural compression, or canal compromise at any level." (Tr. 19). Watson's cervical MRI revealed "normal findings." *Id.* X-rays of Watson's sacroiliac joints were normal.[13] *Id.* Multiple nerve-conduction studies resulted in findings that are "no more than mild in severity." *Id.* An EMG showed only mild neuropathy in Watson's right leg. (Tr. at 19, 351–354). An EMG of the upper extremities showed only mild bilateral ulnar nerve entrapment neuropathy and mild left carpal tunnel syndrome. (Tr. at 19, 1144). Furthermore, the clinical findings from Watson's physical examinations were also generally normal. (Tr. 21, 333–334, 336–337, 351, 354, 368, 371, 374, 377).

Taking all of this together, the ALJ gave proper deference to Watson's medical records.

### 3. The ALJ established a proper RFC for Watson.

Watson contends that the RFC did not incorporate all of his limitations. (Doc. 9 at 21). For the reasons discussed below, the Court finds that Watson's RFC is supported by substantial evidence.

A claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). In determining the claimant's RFC, the ALJ has a duty

---

[13] Normal clinical findings may support an ALJ's decision to deny benefits. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of his impairments. *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

> Watson's RFC allowed for light work with the following restrictions:
>
> claimant cannot climb ladders, ropes, and/or scaffolds; the claimant can only occasionally stoop; the claimant can frequently avoid concentrated exposure to excessive vibrations, extreme cold, hazardous machinery, and unprotected heights; the claimant can frequently handle and finger bilaterally; and the claimant can have no more than occasional exposure to irritants such as fumes, odors, dust, and gasses, and to poorly ventilated areas.

(Tr. at 18). This was a more restrictive RFC than assessed by the non-examining state-agency medical experts—Dr. Dorothy Leong, MD and Dr. Stephan Bradly, MD. Dr. Leong opined that Watson (1) was able to frequently climb ladders, ropes, and/or scaffolds; (2) was able to perform unlimited stooping; and (3) had no manipulative limitations. (Tr. at 87). Likewise, Dr. Bradley opined that Watson (1) was able to occasionally climb ladders, ropes, and/or scaffolds; (2) could have unlimited contact with vibrations; and (3) only had limitations on his handling and fingering for his left hand. (Tr. at 95–96). The ALJ found Dr. Leong's and Dr. Bradley's opinions unpersuasive, as they "do not adequately account for the limitations caused by [Watson's] carpal tunnel pain, neuropathy, or paresthesia." (Tr. at 22). Further, the ALJ found Dr. Henry Allen's opinions limiting Watson to "only sit in chairs with back support" and "to not work the 3rd shift . . . to have a work environment without unneeded stress/anxiety" unpersuasive because (1) Dr. Allen provided no objective medical evidence to support the limitations he assessed and (2) the limitations he assessed were not otherwise supported by medical evidence appearing elsewhere in the record. (Tr.

at 22, 1674).

As explained more thoroughly above, the ALJ properly considered Watson's subjective complaints in combination with the objective medical evidence in determining Watson's RFC. Watson, however, requests that the ALJ go further and account for "how such impairments *may* be exacerbated, and/or exacerbate one another, as well as medications and their side effects." (Doc. 9 at 21). Watson does not expand on which impairments may be exacerbated by outside forces or each other nor does Watson explain what medications and their *potential* side effects he is speaking of. Essentially, Watson argues that the ALJ should have drawn all possible inferences in Watson's favor. However, such a reading is precisely what an ALJ cannot do. *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975) ("[A]n administrative judge may not draw upon his own inferences from medical reports."); *Adamczyk v. Saul*, 817 F. App'x 287, 289 (8th Cir. 2020) ("[T]he ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own."); *see also Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (quoting *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)).

Based on the limitations in the RFC, the Court finds the ALJ credited Watson's symptoms and impairments but found them not to be as severe, persistent, or limiting as Watson alleged. The ALJ noted that the objective findings were grossly normal, as were clinical musculoskeletal exams. (Tr. at 19). Treatment was conservative and did not involve surgical intervention. (Tr. at 20). Watson was shown to respond very well to his course of physical therapy treatment. *Id.* The ALJ credited Watson's diagnoses and limited Watson from climbing ladders, ropes, and/or scaffolds entirely. (Tr. at 21). The ALJ properly

considered Watson's allergies and limited his exposure to allergens to only occasionally. *Id.* Likewise, the ALJ took into account that Watson should avoid excessive vibrations given his paresthesia and neuropathy. *Id.*

For all of these reasons, the Court finds that the ALJ considered all of Watson's impairments and properly assigned an RFC reflective of all of Watson's credible limitations. The Court finds no error.

### 4.    The ALJ did not err at Step Five.

Watson contends that the ALJ erred at Step Five,[14] but again, for the reasons discussed below, the Court finds no reversible error. For his Step Five argument, Watson reiterates his earlier arguments (which have been addressed above), and he states that the ALJ did not give deference to the medical evidence (which was also addressed previously). The ALJ discussed evidence of record at each step of the sequential analysis and provided a thorough review of the medical record. The ALJ asked the VE hypotheticals, capturing all of Watson's limitations.[15] The VE testified that there were jobs available in those hypothetical scenarios, and the ALJ properly relied upon this testimony.

Watson additionally makes a speculative argument in his Reply that he would have too many absences due to medical treatment to be able to work. (Doc. 12 at 3–4). To support this claim, Watson alleges that he had 31 medical appointments in 2017, 45

---

[14] At Step Five, the burden shifts to the ALJ to show that there are significant numbers of jobs in the national economy that the claimant can perform. He relies upon VE occupational testimony to meet this burden. See *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997).

[15] A hypothetical question need only include those impairment and limitations found credible by the ALJ. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

14

appointments in 2018, 10 appointments in 2019, 42 appointments in 2020, 29 appointments in 2021, 15 appointments in 2022, and 3 appointments in 2023 through April. *Id.* at 3. Even assuming that these numbers are accurate, they illustrate that, at the time of the decision, the number of appointments for the prior *two* years did not meet, let alone exceed, two appointments a month. In fact, by Watson's own account, in 2023, he would have had at least one month without a single absence due to medical appointments. Accordingly, Watson's contention that absenteeism should have been included in the RFC is simply not borne out by the record.

Finally, Watson speculates that breaks would be necessary *if* he is exposed to any allergens that require the use of his epi-pen. (Doc. 12 at 6). The record is devoid of any mention of Watson needing to use his epi-pen since it was prescribed to him. Any claim of needing to take a break due to the risk of anaphylactic shock is purely speculative.

In short, the hypotheticals posed to the VE by the ALJ accurately reflected Watson's RFC; there was no error in the ALJ's conclusion at Step Five that Watson can perform work that exists in the national economy, given his RFC, age, education, and work experience. For all of these reasons, the Court finds that the ALJ did not err at Step Five.

## IV.  CONCLUSION

There is substantial evidence to support the Commissioner's decision that Watson was not disabled. The ALJ properly considered Watson's subjective complaints of pain and the objective medical evidence, the RFC incorporated all of Watson's limitations, and

the RFC and the Step Five hypotheticals to the VE incorporated all of Watson's credible limitations.

IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's decision be AFFIRMED.

2. Judgment be entered for the Defendant.

DATED this 21st day of March, 2025.

_____
UNITED STATES MAGISTRATE JUDGE